IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF NIKO M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF NIKO M., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,
v.
TAMECKA G., APPELLANT, AND SALOME M., APPELLEE AND CROSS-APPELLANT.

IN RE INTEREST OF SAMARI M., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,
v.
TAMECKA G., APPELLANT, AND SALOME M., APPELLEE AND CROSS-APPELLANT.

Filed July 23, 2013.   Nos. A-12-860, A-12-861.

Appeals from the Separate Juvenile Court of Lancaster County: LINDA S. PORTER, Judge.
Affirmed.

Jonathan Braaten, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Steffanie J. Garner Kotik, of Kotik & McClure Law, for appellee Salome M.

Ashley Bohnet, Deputy Lancaster County Attorney, for appellee State of Nebraska.

PIRTLE and RIEDMANN, Judges, and MULLEN, District Judge, Retired.

RIEDMANN, Judge.

I. INTRODUCTION

The separate juvenile court of Lancaster County terminated the parental rights of Tamecka G. and Salome M. to their children, Samari M. and Niko M. Tamecka appeals, and Salome cross-appeals. We affirm the termination of Tamecka's parental rights because we conclude the State proved by clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interests of the children. We also find that

- 1 -

Salome did not properly cross-appeal and therefore affirm termination of his parental rights as well.

## II. BACKGROUND

Tamecka and Salome are the biological parents of Samari, born October 2010, and Niko, born September 2011. However, the majority of the pertinent evidence in this case begins prior to the births of these two children. Tamecka has given birth to nine children total. In the 1990's, Tamecka lived in Houston, Texas, and was in a relationship with Michael W. Tamecka and Michael had five children: Marshawn W., Maxwell W., Maximillian W., Michelle W., and Maxine W. Maxwell was born premature and died 12 hours after his birth. Maximillian also suffered an untimely death, the details of which will be set forth more fully below. Tamecka has relinquished her parental rights to Marshawn, Michelle, and Maxine.

In early 2000, Tamecka ended her relationship with Michael and moved to Omaha, Nebraska, with Marshawn, Maximillian, Michelle, and Maxine. Shortly after moving to Omaha, Tamecka began a relationship with Timothy S. Tamecka and Timothy had two children: Silovonni S. and Selario S. Tamecka has relinquished her parental rights to Silovonni, and Selario is currently under the guardianship of another family member.

On March 7, 2001, Tamecka went to her job as a certified nursing assistant at a hospital. She left the children at home with Timothy. When Timothy picked Tamecka up from work, he told her that he had burned Maximillian with hot bath water. When Tamecka got home, she found Maximillian lying in his bed. He had gauze bandages wrapped around his head, arms, and legs and had burns covering approximately 75 percent of his body. Tamecka and Timothy continued to check on Maximillian and change his gauze throughout the night. They did not seek medical attention for Maximillian because they were afraid that their other children might be taken away from them. The following day, Maximillian began vomiting, and he died that night. Timothy wrapped Maximillian's body in garbage bags and placed it in the basement of their house. Two nights later, Timothy and Tamecka buried Maximillian's body at a construction site.

In July 2001, Tamecka's daycare provider called the police because she noticed injuries on 18-month-old Michelle's bottom. The injuries were a result of Timothy's whipping Michelle on the bottom with a clothes hanger because she had taken off her diaper and smeared feces on the window. Tamecka had been aware of Michelle's injuries prior to the daycare provider's calling the police, but Tamecka had not called the police or Child Protective Services, nor had she sought any sort of assistance for Michelle. When the police were talking with Tamecka about Michelle, they also inquired about Maximillian. Tamecka told the police that Maximillian was in Houston with his father, Michael.

Shortly after the incident with the police, Tamecka, Timothy, and the children fled to Colorado to stay with Timothy's aunt. After living in Colorado for a few months, Tamecka, Timothy, and the children went to Houston to stay with Tamecka's aunt. Tamecka told her aunt what happened with Maximillian, and her aunt called the police. The police asked Tamecka's aunt to wear a wire and record a conversation between her and Tamecka about Maximillian. During the recorded conversation, Tamecka told her aunt the entire story about Maximillian's death and burial. About 30 minutes after the conversation, the police arrived and took Tamecka to the police station for questioning.

Tamecka was eventually extradited to Omaha. She cooperated with the investigation and described the location of Maximillian's body for police. The police recovered the body on January 10, 2002. An autopsy was performed the following day, but the coroner was unable to determine Maximillian's cause of death because the body was too decomposed. Tamecka was ultimately convicted of child abuse resulting in death for her role in Maximillian's death and was sentenced to 20 years' imprisonment.

In late 2009, while Tamecka was incarcerated at the Community Corrections Center on work release, she met Salome, an inmate at the same facility. Salome was serving a sentence for attempted first degree sexual assault of a child. At the time, Salome had seven children by four other women. His parental rights to one of his children had been terminated in May 2009 for abandonment.

A few months after Tamecka began a relationship with Salome, she became pregnant with Samari. Salome was released from incarceration in June 2010. At the time of Samari's birth in October, however, Salome had no permanent residence and was staying with different friends. Despite this, and aware of his status as a registered sex offender, Tamecka planned on sending Samari home from the hospital with Salome. Instead, the State took custody of Samari, and she was later adjudicated as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008). Samari has been in foster care since her birth.

Tamecka and Salome married in December 2010, and Tamecka became pregnant with Niko that month. Salome was again incarcerated in March 2011 for domestic assault, failure to register as a sex offender, and failure to pay child support. His anticipated parole date was November 2012, and his expected release date was December 2013. Thus, when Niko was born in September 2011, Tamecka and Salome were both incarcerated. The State took custody of Niko at birth, and he was later adjudicated to be a child within the meaning of § 43-247(3)(a). Niko has also been in foster care since his birth.

Tamecka has had visits with her children since their births, except for a period from February through November 2011 when she was returned to a locked facility after violating the rules of work release. She was released from incarceration in December 2011.

The State moved to terminate Tamecka's and Salome's parental rights to Samari and Niko on February 22, 2012. The termination hearing was held on May 10 and 11 and June 19.

Clinical psychologist Dr. Tanya Randolph-Elgin testified at the hearing. She performed a psychological evaluation and personality inventory on Tamecka in December 2003 to determine her needs and placement during incarceration. Dr. Randolph-Elgin described Tamecka as a person who has extreme criminality in her thinking and behavior. This means she is very self-centered, has little regard for other people, tends to see herself as a victim of others or of circumstances rather than taking ownership for her own choices, tends to be manipulative, and tends to engage in high-risk behaviors. People with this type of thinking also tend to make choices that are focused on what is in their best interests rather than thinking about how their choices may impact others. Dr. Randolph-Elgin testified that more than likely, people with extreme criminality in thinking and behavior will not change their way of thinking.

Dr. Randolph-Elgin also concluded that Tamecka has high intellectual functioning. She testified that the combination of extreme criminality in thinking and high intellectual functioning

is dangerous because these types of people are able to manipulate situations to get away with something and for their own benefit rather than what would be best for other people.

In contrast, psychologist Dr. John Herdman also testified. He performed a personality inventory on Tamecka in December 2011 and January 2012, and her results were within the normal limits. Dr. Herdman had reviewed the conclusions reached by Dr. Randolph-Elgin and testified that it is possible for someone to take a personality inventory at a later date and obtain different results.

Dr. Herdman also began counseling for Tamecka in January 2012. The focus of her counseling has been on better decisionmaking in relationships and daily living. Dr. Herdman testified that he and Tamecka have discussed the situation with Maximillian and that she now accepts that it was an error in judgment to not seek medical attention for him. He believes that Tamecka has accepted responsibility for Maximillian's death because she acknowledges she made bad decisions at the time and because she has guilt over things that she wishes she had done differently. Although Dr. Herdman does not believe that Tamecka is a danger to herself or her children, he admitted that she never disclosed that Timothy had been abusive to her and her children and never told him about the incident with Michelle.

Dr. Herdman was asked why he believes that Tamecka has demonstrated she is in a position to parent children again, and he said that generally a person has a pattern of making very poor decisions but that he has not seen that with Tamecka. He responded that it has been 11 years since Maximillian's death and that it was fear of the implications of burning Maximillian that led Tamecka to make some poor decisions. He noted that since her release, she has obtained employment, found appropriate housing, complied with the directives for services, and made her visits with her children. Dr. Herdman admitted that he is aware of her relationship with Salome and that it concerns him, but he said he has addressed it with Tamecka with respect to making better decisions about relationships. Dr. Herdman believes Tamecka needs a minimum of another year of therapy.

The case manager from the Department of Health and Human Services (DHHS) testified at the termination hearing. She admitted that Tamecka has made excellent progress toward her case plan goals since her release from incarceration. Tamecka obtained her own apartment without any help from DHHS, and according to the case manager, the apartment was very clean and well-kept, it had all the needed furniture, and everything was in working order. It also had food, diapers, toys, and sufficient space for visits with the children. Tamecka also found full-time employment and is able to pay all of her bills. She is participating in therapy with Dr. Herdman, has completed a parenting class, and has consistently tested negative for all substances since her release. The case manager testified that Tamecka was always very cooperative, responsive, engaged, and willing to do whatever was asked of her. She stated that she had no problems with Tamecka whatsoever.

Despite Tamecka's progress, the case manager was not willing to recommend that Samari and Niko be returned to Tamecka's care. The reasons for this are Tamecka's poor decisionmaking skills with respect to Maximillian, her continued poor choices with respect to her relationship with Salome, and her plan to allow Salome to care for Samari when she was first born despite Salome's having a criminal history and no stable residence.

Samari's and Niko's foster mother testified. According to her, Samari is doing very well and has exceeded her milestones. Niko has some medical issues which require extra care, including hyperextension, meaning his muscles are very stiff and tight. He goes to physical therapy three times a month, and the foster mother and her husband do exercises with him daily. Niko also has a breathing issue, which requires daily breathing treatments with a nebulizer. Despite these medical issues, Niko is doing better than expected. The foster mother testified that Samari and Niko get along very well with her four biological children and that they would like to provide permanency for both children.

At the time of the termination hearing, Tamecka was having supervised visits with Samari and Niko one time per week for two hours. The foster mother testified that Tamecka has consistently attended visits. She would sometimes give the children new clothing or toys during the visits, and they were the right size and age-appropriate. The foster mother had no concerns about the physical nature of the children upon returning from visits. They never returned in soiled diapers, and there was no indication of any inappropriate food being given to the children during visits. She has not noticed a significant change in the children's behavior after visits with Tamecka. When the foster mother would send a notebook with information on the children, Tamecka would write appropriate information in it.

Tamecka requested more visits with her children, and DHHS was going to increase the visits, but once the State filed a motion to terminate Tamecka's parental rights, DHHS did not believe increasing visits would be in the children's best interests. The case manager testified that DHHS was willing to increase visits, because there were no concerns for the children's safety or welfare during the visits, and that visitation would still be fully supervised.

After the termination hearing, the juvenile court entered an order terminating Tamecka's and Salome's parental rights to Samari and Niko. The court found that Tamecka had substantially and repeatedly or continuously neglected and refused to give her children necessary parental care and protection, that reasonable efforts have failed to correct the conditions leading to adjudication under § 43-247(3)(a), and that Tamecka had subjected another minor child to aggravated circumstances, specifically, torture. With respect to Samari, the court found that she had been in an out-of-home placement for 15 or more of the most recent 22 months. The court found the same statutory grounds existed with respect to Salome, except that the aggravated circumstances included sexual abuse. Further, the court found that termination of Tamecka's and Salome's parental rights was in the best interests of Samari and Niko. Tamecka timely appeals to this court, and Salome cross-appeals.

## III. ASSIGNMENTS OF ERROR

On appeal, Tamecka alleges the juvenile court erred in (1) finding that the State proved by clear and convincing evidence that Tamecka had substantially and continuously or repeatedly neglected and refused to give her minor children necessary parental care and protection, (2) finding that the State proved by clear and convincing evidence that Samari and Niko had previously been determined to be juveniles as described in § 43-247(3)(a) and that reasonable efforts under the direction of the court have failed to correct the conditions leading to that determination, and (3) finding that the State proved by clear and convincing evidence that terminating Tamecka's parental rights to Samari and Niko was in the children's best interests.

On cross-appeal, Salome, as appellee, asserts the same assignments of error as Tamecka. Salome has not, however, designated his brief as a cross-appeal as required by Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2012).

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jorge O.*, 280 Neb. 411, 786 N.W.2d 343 (2010).

## V. ANALYSIS

### 1. TAMECKA'S APPEAL

#### (a) Grounds for Termination

The bases for termination of parental rights are codified in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012). Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Tamecka's parental rights to Samari and Niko, the juvenile court found that the State had proved three of the conditions contained in § 43-292 by clear and convincing evidence, namely subsections (2), (6), and (9). Further, the court found that subsection (7) existed with respect to Samari only.

On appeal, Tamecka does not challenge the court's findings that she had subjected another minor child to aggravated circumstances and that Samari had been in an out-of-home placement for 15 or more months. She therefore concedes these conditions, and we affirm the juvenile court's finding that the State sufficiently proved grounds for termination of Tamecka's parental rights to Samari and Niko under § 43-292(9) and to Samari under only § 43-292(7).

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010). Therefore, this court need not review termination under § 43-292(2) or (6). Once a statutory basis for termination has been proved, the next inquiry is whether termination is in the child's best interests.

#### (b) Samari's and Niko's Best Interests

Tamecka contends the juvenile court erred in finding that terminating her parental rights was in Samari's and Niko's best interests. She argues the question is not whether she was a good mother to Maximillian; rather, she focuses on what she has done during the lives of Samari and Niko and claims she has done everything that has been asked of her. We acknowledge and commend Tamecka for everything she has accomplished since her release from incarceration. Even the DHHS case manager described Tamecka's progress as "excellent."

However, after reviewing all of the evidence, we are not convinced that Tamecka's judgment and willingness to place her children above herself and her relationships has improved

to the point that it is in Samari's and Niko's best interests to reunite with her. Tamecka became pregnant twice while incarcerated, knowing that neither she nor the father of her children was in a position to care for a child. Before becoming pregnant, Tamecka knew that Salome was a convicted sex offender, that he already had seven children and had lost his parental rights to one of them, and that he was not paying child support for his children. Yet, she chose to conceive children with him and eventually marry him.

In addition, Tamecka testified that she knew of Salome's convictions for domestic assault but downplayed his role in the incidents, stating, "I know that he's a good guy and I know that some things do get out of hand with certain - sometimes, certain incidents, you know, and I wasn't there." She stated that she does not have any concerns about Salome's history of violence and does not view him as a threat to her or her children. Unless prevented from doing so by the court, Tamecka intends to resume her relationship with Salome when he is released so they can parent their children together.

We recognize the opinions that Dr. Herdman rendered at the termination hearing but find it difficult to give much weight to his testimony for two reasons. First, Dr. Herdman concluded that Tamecka is able to safely parent Samari and Niko based on his belief that Tamecka has accepted responsibility for her role in Maximillian's death. We are not convinced that Tamecka has actually accepted full responsibility for her role in Maximillian's death, as Dr. Herdman suggested, because she was less than forthcoming about her actions while testifying at the termination hearing. In 2001, Tamecka told her aunt and the police that she went with Timothy to bury Maximillian's body at the construction site, and she was able to describe the location for police, which enabled them to recover the body. During her testimony at the hearing, however, Tamecka claimed that she did not go with Timothy to bury Maximillian's body and claimed that she had lied to police to protect Timothy.

In addition, Dr. Herdman opined that Tamecka is not a danger to herself or her children. Tamecka, however, never told Dr. Herdman that Timothy was abusive to her or her children or that she failed to protect Michelle from Timothy's abuse. Either Tamecka was not being truthful in her testimony in order to defend the fact that she protected Timothy over Michelle's safety and continued her relationship with him despite his abusing her children, or she was not being truthful in her statements to Dr. Herdman, which causes us to question his conclusions and opinions. Either way, Tamecka's dishonesty is concerning because we are unable to determine whether Tamecka has accepted responsibility for her poor decisions in the past and begun to work through the reasons for them in her therapy or whether she is still trying to protect herself at the risk of her children.

We understand Maximillian's death occurred more than 11 years prior to the termination hearing in this case, and it is entirely possible for a parent to mature and make sufficient progress in that amount of time. But based on the above evidence of decisions Tamecka has made since 2001, we are not convinced that Tamecka will prioritize the safety of her children over herself and her relationships. We therefore conclude that terminating Tamecka's parental rights would be in Samari's and Niko's best interests.

## 2. SALOME'S CROSS-APPEAL

We next address Salome's purported cross-appeal. Salome filed a "Brief of Appellee Salome [M.]" with this court. While assignments of error are made, there is no designation of a cross-appeal. In *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999), the Nebraska Supreme Court refused to address assignments of error in an appellee's brief not designating a cross-appeal. The court in *In re Interest of Natasha H. & Sierra H.* explained that "the appellate courts of this state have always refused to consider a prayer for affirmative relief where such a claim is raised in a brief designated as that of an appellee," 258 Neb. at 146, 602 N.W.2d at 451, and "have repeatedly indicated that a cross-appeal must be properly designated, pursuant to rule 9(D)(4), if affirmative relief is to be obtained," 258 Neb. at 145, 602 N.W.2d at 450. Section 2-109(D)(4) provides:

> Where the brief of appellee presents a cross-appeal, it shall be noted on the cover of the brief and it shall be set forth in a separate division of the brief. This division shall be headed "Brief on Cross-Appeal" and shall be prepared in the same manner and under the same rules as the brief of appellant.

Parties wishing to secure appellate review of their claims for relief must be aware of, and abide by, the rules of this court in presenting such claims. *In re Interest of Natasha H. & Sierra H., supra.* Any party who fails to properly identify and present its claim does so at its peril. *Id.* Salome has not complied with the rules of this court, and we therefore do not address his assignments of error.

## VI. CONCLUSION

We conclude that the State sufficiently proved statutory grounds for termination of Tamecka's parental rights to Samari and Niko and that termination is in the children's best interests. Because Salome did not properly cross-appeal, we do not address his assignments of error and therefore affirm the termination of his parental rights to Samari and Niko as well.

AFFIRMED.